UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x

WILLIAM LEWIS,                    |          11-CV-5044-JW
                                  |
            Plaintiff,            |
                                  |
        - against -               |
                                  |
THE CITY OF NEW YORK, et al.,     |
                                  |
            Defendants.           |

---------------------------------------------------------x


## PLAINTIFF LEWIS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NESENOFF & MILTENBERG, LLP
Of Counsel: Philip A. Byler, Esq.
Andrew T. Miltenberg, Esq.
Megan S. Goddard, Esq.
363Seventh Avenue - 5th Floor
New York, New York 10001
212-736-4500

JEFFREY LICHTMAN, ESQ.
Law Offices of Jeffrey Lichtman
750 Lexington Avenue - 15th Floor
New York, New York 10022
212-581-1001

Attorneys for Plaintiff William Lewis

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................ii

PRELIMINARY STATEMENT ...........................................................1

STATEMENT OF FACTS ...................................................................1

    A.    Plaintiff Lewis: Personal Background; Medals, Commendations
          And Highly Competent Ratings In 25 Years With NYPD..............................1

    B.    Administrative Charges 2006-2007; You Tube Video Blowing
          Cover Of Undercover Operation 2007; Internal Affairs Bureau
          Brought Charges 2008 ...................................................................3

    C.    The "Settlement" Rejected By Commissioner Kelly .......................................6

    D.    First Departmental Disciplinary Trial: Plaintiff
          Lewis Found Not Guilty Of The Corruption Charges
          Brought With Phony Evidence But The NYPD
          Still Seeks Termination...................................................................8

    E.    The Internal Affairs Bureau Investigation Of Structuring
          and The Arrest Of Plaintiff Lewis For "Structuring" .....................................14

    F.    The Departmental Prosecution For Failure To Supervise; The
          NYPD Seeks But Is Refused Termination For Cumulative Charges .............16

    G.    The Termination Of Plaintiff Lewis Without Pension
          By Order Of Commissioner Kelly ..................................................17

    H.    Plaintiff Lewis Found Not Guilty Of "Structuring"........................................19

    I.    Plaintiff Lewis' Damaged Reputation and Finances .......................................21

STATEMENT OF PROCEDURAL HISTORY ...................................................22

SUMMARY JUDGMENT STANDARD ...........................................................24

ARGUMENT..................................................................................................25

I.  PLAINTIFF LEWIS' DEPARTMENTAL TRIAL CAN SERVE
    AS A BASIS OF A MALICIOUS PROSECUTION CLAIM...................................25

    A.  A § 1983 Malicious Prosecution Claim Can
        Be Based On A Disciplinary Proceeding........................................26

    B.  Individual Defendants Kelly, Campisi, Carione and Crespo
        Were Involved In The Departmental Prosecution Of
        Plaintiff Lewis On Corruption Charges..........................................28

    C.  There Was No Probable Cause For Plaintiff Lewis'
        Departmental Trial On Corruption Charges ...................................30

    D.  Defendants Acted With Malice ....................................................31

II. PLAINTIFF LEWIS' § 1983 CLAIMS FOR FALSE ARREST
    AND MALICIOUS PROSECUTION FOR "STRUCTURING"
    ARE MERITORIOUS.................................................................................32

    A.  Defendant Sarayli Was Involved In Plaintiff Lewis'
        Arrest and Prosecution For "Structuring" ......................................32

    B.  The Second Circuit Requires Probable Cause To
        Immunize An Arrest ...................................................................34

    C.  There Was No Probable Cause For The
        Arrest of Plaintiff Lewis For "Structuring" ...................................34

    D.  Plaintiff Lewis Can Overcome Any Presumption Of
        Probable Cause That Attaches To The Indictment..........................36

III. PLAINTIFF LEWIS ADEQUATELY PLED AND HAS A
     MERITORIOUS § 1983 DEFAMATION STIGMA PLUS CLAIM ......................37

IV. THE DEFENDANT CITY OF NEW YORK IS LIABLE
    UNDER *MONELL* ..................................................................................38

CONCLUSION ............................................................................................41

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Albright v. Oliver*, 510 U.S. 266 (1994) ..................................................................26

*Alcantara v. City of New York*, 646 F.Supp.2d 449 (S.D.N.Y. 2009) ...........................32-33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................................25

*Bishop v. Wood*, 426 U.S. 341 (1976) ..................................................................37, 38

*Boose v. Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740 (4th Dep't 1979) ..............................34

*Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995) ..................................................................29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................................24

*Davis v. United States*, No. 03-1800, 2004 U.S. Dist. LEXIS 2551
    (S.D.N.Y. Feb. 18, 2004) ..................................................................34

*DiBlasio v. Novello*, 344 F.3d 292 (2d Cir. 2003) ..................................................................37

*Espada v. Schneider*, 522 F.Supp.2d 544 (S.D.N.Y. 2007) ..............................................33

*Illinois v. Gates*, 462 U.S. 213 (1983) ..................................................................35

*Jeffreys v. City of New York*, 426 F.2d 549 (2d Cir. 2005)..............................................24

*Johnson v. City of New York*, 2008 U.S. Dist. LEXIS 78984 (S.D..Y. 2008) .....................30

*Krulik v. Board of Education*, 781 F. 2d 15 (2d Cir. 1986) ............................................40-41

*Lahan v. Safir*, No. 98-3115 (RCC), 2001 U.S. Dist. LEXIS 18617
    (S.D.N.Y. Nov. 14, 2001) ..................................................................26

*Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir. 1996) ........................................31-32

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) .............25

*Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978) .......................................38-40

*Patterson v. City of Utica*, 370 F.3d 32, 330 (2d Cir. 2004) ...............................37

*Pierson v. Ray*, 386 U.S. 547 (1967) ..................................................................35

*Pucino v. Verizon Wireless Communications Inc.*, 618 F.3d 112 (2d Cir. 2010)................25

*Rae v. County of Suffolk*, 693 F.Supp.2d 217 (E.D.N.Y. 2010) ..........................36

*Ramseur v. Chase Manhattan Bank*, 865 F.2d 460 (2d Cir. 1989) .....................24

*Ricciuti v. New York City Transit Authority*, 124 F.3d 123 (2d Cir. 1997) ...............35

*Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).................................39-40

*Rodriguez v. City of New York*, 72 F.3d 1051 (2d Cir. 1995) ............................25

*Rothberg v. Paulk*, _ U.S. _, 132 S.Ct. 1497 (2012) ....................................36

*Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006) ...........................37

*Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995) ............................27

*Thomas v. New York City*, 814 F. Supp. 1139 ( E.D.N.Y 1993) ........................41

*Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999) ..............................29-30

*T.S. ex rel v. Muhammed*, 2008 WL 4446671 (E.D.N.Y 2008) .........................41

*United States v. All Funds Distributed to Weiss*, 345 F.3d 45 (2d Cir. 2003) ...............24-25

*United States v. Collado*, 348 F.3d 323 (2d Cir. 2003) ....................................24

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004) ...............25

*Villante v. Department of Corrections*, 786 F. 2d 516 (2d Cir. 1986) ...............41

*Washington v. County of Rockland*, 373 F.3d 310 (2d Cir. 2004) .......................26, 27

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) ................................................34, 35

*Wong v. Yoo*, 649 F.Supp.2d 34 (E.D.N.Y. 2009) .............................................30

## **Constitutional Provisions, Statutes and Rules**

18 U.S.C. § 5313 ...............................................................................................20, 35

42 U.S.C. § 1983 ....................................................................1, 22, 25, 26, 28,
32, 35, 36, 37,
38, 39

Rule 56(c), Federal Rules of Civil Procedure ................................................24-25

## PRELIMINARY STATEMENT

Plaintiff William Lewis ("Plaintiff Lewis"), a decorated and highly rated police officer with the New York Police Department ("NYPD") for 25 years before being dismissed on March 9, 2010 without the pension he had earned despite the lack of any conviction for corruption or a crime, very respectfully submits Memorandum of Law in opposition to Defendants' motion for summary judgment dismissing the Complaint. As explained herein, the motion should be denied because there are genuine issues of material fact and Defendants are not entitled to judgment as a matter of law in this action brought by Plaintiff Lewis under 42 U.S.C. § 1983 to remedy what has been an injustice.

## STATEMENT OF FACTS

Defendants' presentation of the facts omits many material facts and evidentiary materials that affect the perception and treatment of this case. Plaintiff Lewis is thus adding to the summary judgment record a considerable amount of evidentiary material in the Declarations of Plaintiff Lewis, Tim Parlatore, Eric Franz and Philip A. Byler and the documents attached to the Declaration of Philip A. Byler, all of which are used for Plaintiff Lewis' Counter-Statement pursuant to Local Rule 56.1 of the U.S. District Courts for the Southern and Eastern District of New York. Because the facts matter in this case, a statement of facts is provided here.

**A.   Plaintiff Lewis: Personal Background; Medals, Commendations and Highly Competent Ratings In 25 Years With The NYPD.**

Plaintiff Lewis, after earning a business degree from the College of Staten Island,

joined the NYPD on January 21, 1985. Following the Academy, Plaintiff Lewis was assigned to the 13th Precinct for six months, then Manhattan South for six years to 1991, then the 122nd Precinct for six years to 1997. Plaintiff Lewis then was made Sergeant in November 1997 and was transferred to the 120th Precinct where he was assigned from 1997 to March 2008, serving as a Sergeant in charge of a Conditions Unit responsible for such matters as underage drinking, prostitution and car theft adversely affecting conditions in a community. From April 2008, to Plaintiff Lewis' termination on March 9, 2010, Plaintiff Lewis was assigned to the Fleet Services. From January 21, 1985 to March 9, 2010 is 25 years, 1 month and 16 days -- well more that the 20 years needed to earn a pension serving in the NYPD. (Byler Decl. Ex. A: Lewis Decl. ¶¶ 2-3.)

During Plaintiff Lewis' service with the NYPD, Plaintiff Lewis earned eleven medals, dating from May 14, 1992 to December 31, 2007, and eight commendations dating from 2000 to 2006. Ten of the medals were for "excellent police duty" and one was for "meritorious police duty." During the time that Plaintiff Lewis worked the Conditions Unit in the 120th Precinct and his immediate supervisor was Peter Sheehan in the years 2005-2008, Plaintiff Lewis shut down 15 bars., and Mr. Sheehan testified that "Billy" Lewis was "excellent." (Byler Decl. Ex. A: Lewis Decl. ¶ 4; Byler Decl. Exs. K-L; Byler Decl. Ex. Z: Sheehan Dep. Tr. 24-25, 40.)

During Plaintiff Lewis' service with the NYPD, Plaintiff Lewis received written performance evaluations that were kept in his personnel file in the regular course of police

operations These service evaluations are set up with a 5 point scale, with 5 being the highest ("extremely competent"), 4 being the next highest ("highly competent") and 3 being mid-range ("excellent"). These performance evaluations show Plaintiff Lewis received an overall rating of 4.5 (between "extremely competent" and "highly competent") in 1999, 2000, 2001, 2002, 2004 and 2005. These performance evaluations show Plaintiff Lewis received an overall rating of 4.0 ("highly competent") in 1992, 1997, 1998 and 2003. The comments portion of the evaluations included: "takes charge individual who never shirks responsibility"; "excellent leadership skills"; "strong leadership qualities"; takes initiative in solving problems"; "demonstrates a high level of integrity"; "willing to make the difficult decisions and consistently exercises good judgment"; 'mature and trustworthy officer who has good work ethics": "has the ability to identify and solve community problems"; "good, sound supervisory skills". The lowest ratings Plaintiff Lewis got were in 2009 and 2010 when he was for two years at Fleet Services at a reduced level of pay; there, he was waiting, he hoped, to be allowed to retire; and even then, he received 3.0 "competent" rating. There were no problems or issues with Plaintiff Lewis while he was in Fleet Services. (Byler Decl. Ex. A: Lewis Decl. ¶ 5; Byler Decl. Ex. M; Byler Decl. Ex. AA: Lester Depo p. 127.)

**B.     Administrative Charges 2006-2007; You Tube Video Blowing Cover Of Undercover Operation 2007; Internal Affairs Bureau Brought Charges 2008.**

In July 2006, two NYPD disciplinary charges were brought against Plaintiff Lewis, one for purchasing and owning real estate for rental purposes within his assigned precinct and another for failing to notify his Commanding Officer of the change of Plaintiff Lewis'

residence and to file an official form indicating a change of Plaintiff Lewis' residence. In April 2007, a third NYPD disciplinary charge was brought against Plaintiff Lewis for engaging in the one month of August 2006 in off-duty employment without authority. Plaintiff Lewis went to the NYPD Advocate's Office both times of his own volition to pick up the charges, after which he freely left. (Byler Decl. Ex. A: Lewis Decl. ¶ 7.)

These three charges brought in 2006 and 2007 were Schedule A offenses under the Patrol Guide and treatable as command discipline matters. Nothing happened concerning them until 2008. The passage of time caused Plaintiff Lewis to contact his union delegates about why the 2006 and 2007 charges were being allowed to grow old without action being taken on them, and the response back from the union was that Plaintiff Lewis had to wait. (Byler Decl. Ex. A: Lewis Decl. ¶ 8; Byler Decl. Ex. D; First Karopkin Decision; Byler Decl. Ex. S: Lewis Depo pp. 333-340; Byler Decl. Ex. H: Franz Fogel Submission.)

Three arrests were made on November 14, 2007 by Vice officers at Beer Googles, a bar in the 120th Precinct in Plaintiff Lewis' area of responsibility. A video of the Vice operation at Beer Goggles was made that showed not just the questionable handling of money, but also the faces of the undercover agent and his "ghost" (NYPD-Vice officer Shawn Charlson) were shown. (Byler Decl. Ex. A: Lewis Decl. ¶ 9; Byler Decl. Ex. Q: Charlson Depo pp. 25, 67; Byler Decl. Ex. R: Charlson Depo Ex. 4.)

NYPD-Vice officer Shawn Charlson was the source of a complaint in December 2008 to the NYPD Internal Affairs Bureau that triggered an investigation and a whole series of

disciplinary charges that were brought against Plaintiff Lewis in late March 2008. (Byler Decl. Ex. A: Lewis Decl. ¶¶ 10.) Defendants Carione and Crespo conducted that investigation. (Byler Decl. Ex. A: Lewis Decl. ¶¶ 10; Byler Decl. Ex. X: Carione Depo pp. 47-49, 61; Byler Decl. Ex. Y: Crespo Depo pp. 57-58, 68.)

Before then, in early March 2008, after more than 23 years of service on the NYPD, Plaintiff Lewis put in his retirement papers for a number of reasons: his girlfriend/soon-to-be wife Kathleen was ill; his parents were ill; his work shift was changed from midnight to the day-time. (Byler Decl. Ex. A: Lewis Decl. ¶ 11; Byler Decl. Y: Crespo Depo pp. 51-52, 70.)

On the day that Plaintiff Lewis put in his retirement papers, he went to the 120th Precinct to tell the Commanding Officer that he had retired. At the same time that day, Captain Carine went to Plaintiff Lewis' house looking for Plaintiff Lewis. His girlfriend/soon-to-be wife Kathleen was there and told Captain Carione that Plaintiff Lewis was at the 120th Precinct. Captain Carione soon showed up at the 120th Precinct to tell Plaintiff Lewis that he had to pull his retirement papers or else he would be fired. Captain Carione also gave Plaintiff a notice to appear at a GO15 hearing at Captain Carione's office in Brooklyn. Plaintiff Lewis felt that he had no real option but to withdraw his retirement papers and did. (Byler Decl. Ex. A: Lewis Decl. ¶ 12.)

About one week later, on March 17, 2008, Plaintiff Lewis appeared for the GO15 at Captain Carione's conference room at Internal Affairs Bureau-Brooklyn. Captain Carione asked Plaintiff Lewis questions for the better part of the day, before and after lunch. During

the hearing, Captain Carione constantly was breaking to make phone calls. After the last phone call, Captain Carione took Plaintiff Lewis' shield and Plaintiff Lewis' NYPD identification card. Plaintiff Lewis was informed that he was on suspension without pay, which meant that he would be hit with disciplinary charges (which Plaintiff Lewis was). Plaintiff Lewis was under no less effective restraint when Captain Carione was interrogating him than when an individual subject to arrest by Plaintiff Lewis. He was not free just to pick up and leave. Meanwhile, that same day, Captain Carione sent a memo to Chief of Internal Affairs Charles Campisi informing him about the suspension of Plaintiff Lewis. (Byler Decl. Ex. A: Lewis Decl. ¶¶ 13-14; Byler Decl. Ex. EE: Carione March 17, 2008 Memo to Campisi re Suspension of Sgt. William Lewis.)

The 2008 charges were of two kinds. There were two charges that were relatively minor: (1) not informing superiors that Plaintiff Lewis' estranged sister worked at a bar within his area of responsibility  and (2) employment of an individual to conduct business dealings on his behalf within his precinct. The other charges, three of them, were very serious corruption matters: (1) revealing an undercover operation, (2) collecting a debt for a third person in an intimidating manner and (3) employing persons who engaged in business dealings on his behalf with establishments participating in illegal gambling. (Byler Decl. Ex. A: Lewis Decl. ¶ 15; Byler Decl. Ex. S: Lewis Depo pp. 333-340; Byler Decl. Ex. H.)

## C.    The "Settlement" Rejected By Commissioner Kelly.

It was in the circumstance of Plaintiff Lewis having been effectively directed by the

-6-

Internal Affairs Bureau to withdraw his retirement papers that the "Negotiated Settlement," dated May 22, 2008, must considered. Plaintiff Lewis' hired counsel Eric Franz negotiated with Kristin O'Neal of the NYPD Advocate's Office and worked out a settlement document entitled "Negotiated Settlement." The attraction to Plaintiff Lewis of the "Negotiated Settlement" were its provisions stating "Respondent will immediately file for service retirement upon approval of this settlement agreement by the Police Commissioner and will retire from the Department while on suspension" and "Upon approval by the Police Commissioner of this settlement agreement, I will file for a service retirement pension and I agree not to withdraw said application for service retirement." The "Negotiated Settlement" would allow Plaintiff Lewis to retire with his pension. (Byler Decl. Ex. A: Lewis Decl. ¶ 16; Nimick Decl. Ex. B.)

Plaintiff Lewis was not enamored at all of the other provisions in the "Negotiated Settlement," such as pleading guilty to all the outstanding charges against him, forfeiting pay and benefits for the period he was under suspension from March 17, 2008 to April 19, 2008, paying $40,000 and remaining under suspension during the process of separation from the NYPD. Plaintiff Lewis did not see himself as guilty of any of the serious corruption matters, but acceptance of such undesirable provisions was the price he was willing to pay in order to retire and have his pension. If Plaintiff Lewis had his retirement and pension, then he would accept the undesirable provisions and additionally agree not sue New York City or the NYPD, as provided for in the "Negotiated Settlement." Also, the union advised Plaintiff

Lewis to take the deal in order to retire. (Byler Decl. Ex. A: Lewis Decl. ¶ 17.)

Plaintiff Lewis and his counsel signed the "Negotiated Settlement." Advocate's Office attorney Kristin O'Neal signed the "Negotiated Settlement." Plaintiff Lewis was assured by his counsel that Deputy Commissioner Julie Schwartz approved of the"Negotiated Settlement." All that stood between Plaintiff Lewis and retirement with pension was the approval of Commissioner Kelly. But that approval was not forthcoming. Commissioner Kelly rejected the settlement. The union advised Plaintiff Lewis that the NYPD leadership wanted to fire him. Plaintiff Lewis asked Chief Devlin, who was in charge of the 120th Precinct and was generally understood to personally know Commissioner Kelly, to speak to Commissioner Kelly, which Chief Devlin did. Chief Devlin reported back to Plaintiff Lewis that "they" wanted to fire him. This meant that Plaintiff Lewis had to hire his own lawyer, and he did in Eric Franz and Tim Parlatore so as to try to save his job and his pension. (Byler Decl. Ex. A: Lewis Decl. ¶ 18; Byler Decl. Ex. GG: O'Neal Depo pp. 31-31; Byler Decl. Ex. HH: Slater Depo pp. 30-32.)

**D.  First Departmental Disciplinary Trial: Plaintiff Lewis Found Not Guilty Of The Corruption Charges Brought With Phony Evidence But The NYPD Still Seeks Termination.**

In the period from November 14, 2008 to January 9, 2009, a disciplinary trial in Disciplinary Case Nos. 82103/06, 82873/07 & 83810/08 was held before Deputy Commissioner-Trials Martin G. Karopkin. Plaintiff Lewis was in attendance throughout and testified at a certain point in the trial. (Byler Decl. Ex. A: Lewis Decl. ¶ 19.)

The written post-hearing summation submitted for Plaintiff Lewis accurately states what had happened at trial: the trial evidence showed an incomplete investigation that had descended into the realm of false evidence and possibly perjury. The serious charge of revealing an undercover police operation was in particular based on uncorroborated, unreliable hearsay, false phone records and an incomplete investigation. The summation for Lewis further stated that the charges appeared to be a coverup for a corrupt Vice squad captured in a video that had been shown at the disciplinary trial and that some of the charges -- allowing off-duty employment authorization, not informing superiors about an estranged sister who working within Plaintiff Lewis' precinct and failing to fill out a change of address form -- were more appropriate for command discipline and appeared to be an effort to stack the deck at trial with respect to serious corruption charges for which the proof was just not there. (Byler Decl. Ex. F: Franz Post-Hearing Submission; Byler Decl. Ex. B: Franz Decl. ¶ 4.)

Most damning was the fact that the trial record was devoid of any evidence supporting the serious corruption charge that Plaintiff Lewis had divulged confidential information regarding an undercover police operation to one Chris Shaffer, the owner of Beer Goggles. The trial record showed, quite differently, that Chris Shaffer had his suspicions about the undercover operation Raddicone from talking with the undercover agent at his bar, which suspicions he discussed with one Enrico Cucco (a former member of 120th Precinct) who told Chris Shaffer that he was likely dealing with an undercover agent in Anthony Raddicone, and

that Shaffer studied the video of the November 14, 2007 raid which was played at the disciplinary trial. The NYPD "case" fell apart in shambles:

• The "proof" of the charge of revealing an undercover operation rested on the hearsay allegation by the undercover agent Anthony Raddicone who did not testify at the disciplinary trial, whose supposed allegation was contradicted by other evidence and who had a personal falling out with Plaintiff Lewis.

• The phone record evidence said by Advocate's Office attorney Kristin O'Neal to be important indisputably did not record any content of phone conversations, was initially inaccurate and misused to wrongly say there were three-way conversations involving Plaintiff Lewis and Chris Shaffer and, when corrected at trial, showed no phone contact between Plaintiff Lewis and Chris Shaffer at all in the period of December 2007 to March 2008.

• The evidence showed that Plaintiff Lewis did not even know about any undercover operation in December 2007, much less disclose it to anyone, when supposedly there was a leak about it, as he had engaged in very active enforcement activity at Beer Googles, issuing numerous summonses to Chris Shaffer, and had not steered clear for an undercover investigation.

• The video of the Vice operation at Beer Goggles on November 14, 2007 showed that the undercover operation had blown its own cover and it had nothing to do with Plaintiff Lewis. The video showed the questionable handling of money and

the faces of the undercover agent and his "ghost" (NYPD-Vice officer Shawn Charlson) were shown.

　　　• The testimony of Daniel Carione, Victor Crespo and Shawn Charlson for the prosecution was evasive and reflective of an incompetent investigation.

(Byler Decl. Ex. A: Lewis Decl. ¶ 20; Byler Decl. Ex. B: Franz Decl. ¶ 5; Byler Decl. Ex. C: Parlatore Decl. ¶¶ 15-27; Byler Decl. Ex. D: First Karopkin Decision; Byler Decl. Ex. F: Franz Post-Hearing Summation; Byler Decl. Ex. S: Lewis Depo p. 308; Byler Decl. Ex. X: Carione Dep. p. 160; Byler Decl. Ex. Y: Crespo Dep. 122.)

　　　With respect to the other two serious corruption charges, Plaintiff Lewis testified that he had not engaged in any intimidation of one Mr. Ali when working off-duty for Richmond Wholesale, and that he did not know of illegal gambling at places where his off-duty employment companies operated. As with the charge concerning revealing an undercover operation, there was no reliable evidence showing that Plaintiff Lewis had collecting a debt in an intimidating manner and that Plaintiff Lewis had employed persons who engaged in business dealings with establishments participating in illegal gambling. The supposed complaining party about intimidation, a Mr. Ali, did not testify; and while Internal Affairs Bureau detective Victor Crespo said that Mr. Ali complained of intimidation to him, the investigation tapes of Mr. Ali's interviews did not show intimidation and nobody else was found who complained about Plaintiff Lewis engaging in intimidation. (Byler Decl. Ex. A: Lewis Decl. ¶ 21; Byler Decl. Ex. D: First Karopkin Decision; Byler Decl. Ex. Y: Crespo

Depo p. 38.)

On March 30, 2009, Deputy Commissioner Karopkin issued a lengthy 202-page recommended decision and a one-page confidential memorandum. On the one hand, Plaintiff Lewis was found guilty or pled guilty to the administrative charges: not informing superiors that a sister worked within the officer's area of responsibility, owning property for rental purposes within the officer's area of responsibility, failing for one month to obtain approval of off-duty employment, employment of an individual to conduct business dealings on my behalf within the precinct and failing to fill out a change of address form. On the other hand, Plaintiff Lewis was found not guilty of the serious corruption charges: revealing an undercover operation, collecting a debt for third person in an intimidating manner and employing persons who engaged in business dealings with establishments participating in illegal gambling. The confidential memorandum of Deputy Commissioner Karopkin to Commissioner Kelly, attached to the Deputy Commissioner Karopkin's decision, noted that Plaintiff Lewis had been appointed to the NYPD on January 25, 1985, that his personnel file showed he had received ratings ranging from 3.5 (competent) to 4.5 (extremely competent) and that Plaintiff Lewis had received eleven medals, ten of which were for excellent police duty and one for meritorious police duty. (Byler Decl. Ex. A: Lewis Decl. ¶ 22; Byler Decl. Ex. B: Franz Decl. ¶¶ 8-9; Byler Decl. Ex. D: First Karokin Decision.)

When Deputy Commissioner Karopkin rendered his decision, the NYPD Advocate's Office and counsel for Plaintiff Lewis submitted letters to Commissioner Kelly. Counsel for

Plaintiff Lewis primarily argued that the punishment was patently excessive, as it rested on the guilty findings as to what were administrative charges that were but Schedule A offenses under the Patrol Guide more appropriate for command discipline: not informing superiors that a sister worked within the officer's area of responsibility, owning property for rental purposes within the officer's area of responsibility, failing for one month to obtain approval of off-duty employment, employment of an individual to conduct business dealings on his behalf within the precinct and failing to fill out a change of address form. Plaintiff Lewis had been found not guilty of the serious corruption charges: revealing an undercover operation, collecting a debt for a third person in an intimidating manner and employing persons who engaged in business dealings with establishments participating in illegal gambling. The excessive severity of the punishment appeared to be rooted in the taint of what were false, unsubstantiated corruption charges. Counsel for Plaintiff Lewis requested in his letter that Plaintiff Lewis not be subjected to probationary dismissal but be allowed to retire for what then was 24 years of service in the NYPD. The position of the NYPD Advocate's Office, both in the post-hearing summation and the letter to Commissioner Kelly, was to argue for termination of Plaintiff Lewis. (Byler Decl. Ex. B: Franz Decl. ¶¶ 7, 11; Byler Decl. Ex. H: Franz Fogel Submission; Byler Decl. Ex. E: NYPD Post-Hearing Submission; Byler Decl. Ex. G: NYPD Fogel Submission to Commissioner Kelly.)

Plaintiff Lewis was put on probationary dismissal for one year by the decision of Deputy Commissioner Karopkin and the order of Defendant Kelly of October 16, 2009

adopting Deputy Commissioner Karopkin's decision. (Byler Decl. Ex. A: Lewis Decl. ¶ 22;

Byler Decl. Ex. D: First Karopkin Decision.)

**E.** **The Internal Affairs Bureau Investigation Of Structuring**
**and The Arrest Of Plaintiff Lewis For "Structuring."**

In July 2009, which was after the decision of Deputy Commissioner Karopkin came

down but before the order of Defendant Kelly adopting the decision of Deputy Commissioner

Karopkin, Plaintiff Lewis reported to the NYPD what Plaintiff Lewis thought was missing

money at his house. Due to Plaintiff Lewis' concerns about his ex-wife somehow getting

hold of the money that he had saved and had kept on deposit at Community Bank (Richmond

County Savings Bank), Plaintiff Lewis had withdrawn what were his monies from the

Community Bank (Richmond County Savings Bank) and had kept it in a safe at his house

where he lived with his now wife Kathleen. The money turned up, as Kathleen Lewis had

hidden it due to issues involving family relationships. As Plaintiff Lewis was to learn, his

report to the NYPD triggered another Internal Affairs Bureau investigation into whether he

had engaged in what he would learn is called "structuring." When Plaintiff Lewis withdrew

the money from Community Bank (Richmond County Savings Bank) and indeed until the

federal trial, he did not know what "structuring" meant. (Byler Decl. Ex. A; Lewis Decl. ¶

23; Byler Decl. Ex. S: Lewis Depo p. 355.)

NYPD-Internal Affairs Bureau officer Frank Sarayli conducted an investigation,

obtaining records from the Secretary of State about Plaintiff Lewis' businesses and

subpoenaing bank records from Community Bank (Richmond County Savings Bank) and

compiled it in a calendar to show withdrawals. Sarayli met with an Assistant United States Attorney and delivered his investigation materials to the U.S. Attorneys Office. Sarayli also met with Immigration and Customs Enforcement ("ICE") agents Shawn Polonet and Christopher Costa. The information contained in Costa's affidavit for an arrest warrant was from Sarayli's subpoenaed information and investigation. (Byler Decl. Ex. S: Sarayli Depo pp. 70-75, 85-87; Nimick Decl. Ex. U: Sarayli calendar; Nimick Decl. Ex. K: Costa Affidavit.)

On November 3, 2009, Plaintiff Lewis was arrested by federal agents and charged with "structuring." Plaintiff Lewis was told by Mr. Costa at the time of Plaintiff Lewis' arrest, when Costa was handcuffing Plaintiff Lewis, that Plaintiff Lewis' arrest was a favor for the NYPD Internal Affairs Bureau and that it would be one more hurdle for Plaintiff Lewis. In late December 2009, an indictment was returned against Plaintiff Lewis by a federal grand jury for structuring in violation of 18 U.S.C. § 5313. Subpoenas for the federal case were all returnable to NYPD-Internal Affairs Bureau office Sarayli. (Byler Decl. Ex. A; Lewis Decl. ¶ 24; Byler Decl. Ex. B: Parlatore Decl. ¶ 46 ; Byler Decl. Ex. S: Lewis Depo pp. 214, 386; Nimick Decl. Ex. N; Byler Decl. Ex. CC: Memo from the Chief of the Internal Affairs Bureau Charles Campisi to Commissioner Kelly.)

That same day, November 3, 2009, the Commanding Officer of the Investigative Review Unit Vito Colamussi sent a memorandum to Chief of Internal Affairs Bureau Charles Campisi and Chief of Internal Affairs Bureau Charles Campisi sent a memorandum to

Commissioner Kelly, both memoranda reporting that Plaintiff Lewis had been arrested by Customs Enforcement that day for structuring and that Vito Colamissi, Chief the Investigative Unit of the Internal Affairs Bureau, had suspended Plaintiff Lewis. (Byler Decl. Ex. CC: Memo from the Chief of the Internal Affairs Bureau Charles Campisi to Commissioner Kelly.)

**F.   The Departmental Prosecution For Failure To Supervise; The NYPD Seeks But Is Refused Termination For Cumulative Charges.**

Meanwhile, Plaintiff Lewis was charged in Disciplinary Case No. Case No. 852709/09 for his alleged failure to supervise his subordinates who allegedly issued fictitious summonses while Plaintiff Lewis was absent on personal leave. Plaintiff Lewis agreed to enter a plea of guilty because: (a) he was not being charged with corruption; (b) he believed that the charge of failing to supervise did not justify termination; and (c) he wanted to make a statement of personal responsibility. The NYPD Advocate's Office, however, argued again that Plaintiff Lewis should be terminated. (Byler Decl. Ex. A; Lewis Decl. ¶ 25; Byler Decl. Exs. I-J: Draft and Final Second Karoipkin Decision.)

The hearing was contentious. The NYPD Advocate's Office attorney was seeking Plaintiff Lewis' termination, but the NYPD Advocate's Office attorney admitted that he could cite no prior case that supported that result and Deputy Trial Commissioner Karopkin firmly rejected termination. Deputy Commissioner Karopkin's decision in the summons case stated that Plaintiff Lewis was not corrupt and rejected the Advocate Office's argument for termination, finding no precedent for it as a penalty for a failure to supervise. (Byler Decl.

-16-

Ex. A; Lewis Decl. ¶ 26; Byler Decl. Exs. I-J: Draft and Final Second Karoipkin Decision.)

At this time, the issue of off-duty employment again arose, as Plaintiff Lewis was informed that his off-duty employment had not been approved. Plaintiff Lewis' response was that he had as a matter of course put in the off-duty applications as he had in the past twenty years, that Plaintiff Lewis had not been informed that his off-duty employment applications had not been approved, but that Plaintiff Lewis would cease immediately such off-duty employment (which he did). Before his termination, Plaintiff Lewis was never served with charges concerning unauthorized off-duty employment. After his termination, he was informed that charges were drawn up, but he never had the opportunity to defend against such charges that Plaintiff Lewis believed were not justified. (Byler Decl. Ex. A; Lewis Decl. ¶ 27; Byler Decl. Ex. P: Off-Duty Employment Applications.)

## G. The Termination Of Plaintiff Lewis Without Pension By Order Of Commissioner Kelly.

In February 2010, Thomas Dale, NYPD Chief of Personnel circulated a memorandum recommending that Plaintiff Lewis be terminated, noting that Plaintiff Lewis had been arrested for structuring. The memo then discussed a number of subjects: the placement of Plaintiff Lewis on probationary dismissal as a result of not informing superiors that a sister worked within the officer's area of responsibility, owning property for rental purposes within the officer's area of responsibility, failing for one month to obtain approval of off-duty employment, employment of an individual to conduct business dealings on his behalf within the precinct and failing to fill out a change of address form; that Plaintiff Lewis had been the

subject of additional investigation concerning structuring, asserting that he had circumvented the reporting requirement by the manner of Bank withdrawals and that Plaintiff Lewis was engaged in unauthorized employment, that another disciplinary case against Plaintiff Lewis for failure to supervise had been adjudicated with a forfeiture of 30 days suspension. The Dale memo concluded that the foregoing had shown Plaintiff Lewis had repeatedly engaged in misconduct. The memo was endorsed by three Deputy Commissioners. (Nimick Decl. Ex. O.)

On March 9, 2010, when Plaintiff Lewis showed up for work at Fleet Services, he was given by Gerard Lester a one-page terse letter signed by Arnold S. Wechsler, Assistant Commissioner, Employee Management Division, informing Plaintiff Lewis that by the order of Commissioner Kelly, Plaintiff Lewis was terminated effective immediately. Gerard Lester signed the letter at the bottom to indicate delivery. Plaintiff Lewis signed the letter at the bottom acknowledging receipt. The letter did not state any reason or reasons for the termination. No explanation was provided by NYPD officer Lester when delivering the letter to Plaintiff Lewis. (Byler Decl. Ex. A; Lewis Decl. ¶ 28; Nimick Decl. Ex. P: March 9, 2010 Dismissal Letter; Byler Decl. Ex. AA: Lester Depo pp. 30-35.)

The effect of the dismissal was that Plaintiff Lewis could not obtain the pension to which, as is generally known, a NYPD veteran of 20 years or more of service is entitled. Yet, Plaintiff Lewis had never been found guilty of any disciplinary charge that justified termination. Charges alleging revealing an undercover operation, engaging in intimidation

and business dealings with establishments participating in illegal gambling would justify termination, but Plaintiff Lewis was found not guilty of those kind of charges. There is not known a single situation where any NYPD officer, much less a 20+ year NYPD veteran without pension rights, has been terminated for such command discipline infractions as not informing superiors that a relative worked within the officer's area of responsibility, owning property for rental purposes within the officer's area of responsibility, failing for one month to obtain approval of off-duty employment and failing to fill out a change of address form. (Byler Decl. Ex. A; Lewis Decl. ¶ 29.)

On March 11, 2010, Deputy Commissioner Julie Schwartz sent a memorandum to Personnel Records Unit to request that a copy of the recent charges for off-duty employment and structuring be included in the personnel file of plaintiff Lewis. (Byler Decl. Ex. DD: Schwartz March 11, 2010 Memo to Personnel Records.)

All of the NYPD documentation relating to the termination did not recognize that Deputy Commissioner Karopkin had rejected termination for the summons proceeding Case No. 852709/09, that Plaintiff Lewis would be acquitted of the "structuring" charge which the Internal Affairs Bureau had developed, and that Plaintiff Lewis was never served with charges for unauthorized off-duty employment before termination, much less given an opportunity to defend against them. (Byler Decl. Ex. A; Lewis Decl. ¶ 30.)

## H.    **Plaintiff Lewis Found Not Guilty Of "Structuring."**

Less than two weeks after his dismissal, Plaintiff Lewis was tried in federal court

located in Brooklyn and was acquitted by the jury of "structuring" in violation of U.S. Code

Title 18, section 5313. (Byler Decl. Ex. A; Lewis Decl. ¶ 31; Nimick Decl. Ex. Q.)

The trial judge had instructed the jury on the three elements of "structuring" in violation of 18 U.S.C. § 5313: (1) the defendant knew that the financial institution was obligated to report currency transactions in excess of $10,000; (2) the defendant engaged in structuring of currency transactions; and (3) the defendant acted with intent to evade the reporting requirement. But the trial evidence fell far short of satisfying these three elements. Plaintiff Lewis had testified that he had not engaged in structuring with an intent to evade the reporting requirement, there was a filing of a CRT and teller Ms. Melissa Dombrowsky at the Community Bank testified to the circumstances of Plaintiff Lewis withdrawing monies in a way that supported Plaintiff Lewis' defense. (Byler Decl. Ex. A: Lewis Decl. ¶¶ 31-32; Byler Decl. Ex. U: Sarayli Depo Ex. 39, Structuring Trial Transcript; Byler Decl. Ex. BB: Dombrowsky testimony in federal structuring trial; Nimick Decl. Ex. Q.)

Present during the trial in the courtroom were representatives of the Internal Affairs Bureau -- specifically, one Frank Sarayli who had done what investigation there was of "structuring." Frank Sarayli admitted being at the federal courthouse, but said another Internal Affairs Bureau officer sat in the courtroom, but did not tell Sarayli what was going on in the trial courtroom. (?) According to Plaintiff Lewis, they were both in the courtroom, they both got to see the federal judge instruct the jury on the elements of "structuring," and they both got to see the jury return the "not guilty" verdict. (Byler Decl. Ex. A; Lewis Decl.

¶ 32; Byler Decl. Ex. T: Sarayli depo pp. 170-171.) On the day of the jury verdict, March 18, 2014, Sarayli sent a memorandum to the Chief of Internal Affairs Bureau Campisi reporting the not guilty verdict and the deliberations of the jury. (Byler Decl. Ex. T: Sarayli Depo pp. 176-178; Byler Decl. Ex. V: Sarayli Memo to Campisi.)

Later that year in August 2010, Frank Sarayli wrote a memorandum for the file "closing" the investigative file on the charges against Plaintiff Lewis for structuring and unauthorized off-duty employment finding them "substantiated." When asked at deposition how he could ignore the federal court verdict finding Plaintiff Lewis not guilty of structuring and how he could make any finding about off-duty employment when Plaintiff Lewis never had an opportunity to respond to the charges, Frank Sarayli said the substantiation was necessary to close the file. (Byler Decl. Ex. W: Sarayli Depo Ex. 39; Byler Decl. Ex. T: Sarayli Depo pp. 218-226.)

## I.    **Plaintiff Lewis' Damaged Reputation and Finances.**

In the end, after numerous expensive, time-consuming, emotion-depleting proceedings, Plaintiff Lewis was terminated from the NYPD without pension as if he had been guilty of corruption when in fact he never was guilty of any corruption and as if the quarter century of Plaintiff Lewis' service to the NYPD and the City of New York -- for which Plaintiff Lewis had received eleven medals, ten commendations and "highly competent" performance evaluations -- meant nothing. (Byler Decl. Ex. A; Lewis Decl. ¶ 33.)

## STATEMENT OF PROCEDURAL HISTORY

A detailed statement of procedural history of the case is provided in Plaintiff Lewis'

Objections to the Magistrate Judge's March 3 Order, a statement of procedural history that

Defendants accepted. (Objections, EDNY ECF Doc. 71, pp. 4-14; Opposition, EDNY ECF

Doc. 72, pp. 1-2.) For convenience of the Court, the following summary procedural history

is stated here.

The Complaint brought by Plaintiff Lewis in October 2011 asserted five causes of

action under 42 U.S.C. § 1983: (1) Defendants' malicious prosecution for fabricated

departmental corruption violations as to which Plaintiff Lewis was found not guilty and the

evidence for which had been falsified; (2) Defendants' false arrest for a fabricated criminal

"structuring" charge as to which Plaintiff Lewis was found not guilty and yet was terminated

as a New York City police officer; (3) Defendants' malicious prosecution for the fabricated

criminal structuring charge as to which Plaintiff Lewis was found not guilty; (4); Defendants'

defamation of Plaintiff Lewis as corrupt, which resulted in his loss of employment status as

a New York City police officer (stigma plus defamation); and (5) the liability of the

Defendant City of New York for its *de facto* policies, practices, customs and usages that

reflected a culture of corruption and condoned and fostered the unconstitutional conduct of

the individual Defendants. (EDNY ECF Doc. 1.)

Defendants never moved to dismiss, but rather after numerous motions by Defendants

for extensions of time to answer (EDNY ECF Docs. 3, 6, 11) and a request by Plaintiff Lewis

for a Default (EDNY ECF Doc. 14), Defendants filed in July 2012 their Answer and their Amended Answer (EDNY ECF Doc. 16-17).

In late 2012, some minor discovery was done by Plaintiff Lewis, but it was after prior Plaintiff's counsel withdrew in June 2013 (EDNY ECF Doc. 30-31) and new Plaintiff's counsel who formally appeared in September 2013 (EDNY ECF Doc. 33) that discovery seriously got underway in late September 2013 with the deposition of Plaintiff Lewis. Both sides moved at various points in time to extend the time for discovery. (EDNY ECF Docs. 36, 56.) Thirteen depositions were taken and document production was made; both sides made motions to compel in discovery litigation before the Magistrate Judge (EDNY ECF Docs. 42-43, 46-47, 63-64); and the Magistrate Judge made a number of rulings (EDNY ECF Docs. 52, 55, 66). The Magistrate Judge's Order of March 3, 2014, denying certain discovery is the subject of Plaintiff Lewis' Objections. (EDNY ECF Doc. 66, 71-73).

Pursuant to Judge Weinstein's Order of November 13, 2014 (EDNY ECF Doc. 45), Defendants filed their motion for summary judgment on March 7, 2014 (EDNY ECF Docs. 67-70), and Plaintiff Lewis' opposition to summary judgment is hereby being filed April 4, 2014. Pursuant to Judge Weinstein's Order dated February 14, 2014, summary judgment will be argued April 14, 2014, pre-trial motion in limine and pre-trial order dates are set for May 20, 2014, jury selection is scheduled for May 19, 2014, and trial is scheduled to begin May 27, 2014. (EDNY ECF Doc. 60.)

## SUMMARY JUDGMENT STANDARD

The basic rules governing summary judgment under Rule 56 of the Federal Rules of Civil Procedure may be summarized as follows.

A court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c); _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986); _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 250 (1986). "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." _Celotex Corp. v. Catrett_, 477 U.S. at 323. "A fact is material . . . when it might affect the outcome of the suit under the governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." _Jeffreys v. City of New York_, 426 F.2d 549, 553 (2d Cir. 2005).

According to the Second Circuit in _United States v. Collado_, 348 F.3d 323, 327 (2d Cir. 2003). "[t]he evidentiary standard that must be met [by a moving party] is a high one, since a court is obliged 'to draw all inferences in favor of the party against whom summary judgment is sought,' _Ramseur v. Chase Manhattan Bank_, 865 F.2d 460, 465 (2d Cir. 1989), and to 'construe the evidence in the light most favorable to the nonmoving party.' _United_

*States v. All Funds Distributed to Weiss*, 345 F.3d 45 (2d Cir. 2003)." *Accord, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *Pucino v. Verizon Wireless Communications Inc.*, 618 F.3d 112, 117 (2d Cir. 2010); *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995).

Once a moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must proffer admissible evidence that sets forth specific facts showing genuine issues of material fact under applicable legal principles. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).

## ARGUMENT

Before the Court is Defendants' motion for summary judgment that is premised on four main arguments. For the reasons that follow, the Defendants' four main arguments are without merit and Defendants' motion should be denied.

## I.

## PLAINTIFF LEWIS' DEPARTMENTAL TRIAL CAN SERVE AS A BASIS OF A MALICIOUS PROSECUTION CLAIM

Defendants' first main argument is that Plaintiff Lewis' Departmental trial cannot serve as a basis of a malicious prosecution claim under 42 U.S.C. § 1983, premising that argument on four points. (Dfs. Mem. of Law, pp. 3-10.) None of these points has merit.

**A.     A § 1983 Malicious Prosecution Claim Can
Be Based On A Disciplinary Proceeding.**

Defendants assert that a § 1983 malicious prosecution action must be based on a

criminal trial, not a civil one, citing an unofficially reported 2001 Southern District case,

*Lahan v. Safir*, No. 98-3115 (RCC), 2001 U.S. Dist. LEXIS 18617 (S.D.N.Y. Nov. 14,

2001), and a 2004 Second Circuit case, *Washington v. County of Rockland*, 373 F.3d 310 (2d

Cir. 2004). (Dfs. Mem. of Law, pp. 4-6.) The short answer is that Second Circuit case law

is to the contrary. In *Washington v. County of Rockland,* a decision written by then Judge

Sotomayor, the Second Circuit expressly stated that "our case law does not forbid a § 1983

malicious prosecution claim premised on a civil or administrative proceeding." 373 F.3d at

317.

The reasoning of the Second Circuit in *Washington v. County of Rockland* allowing

for a § 1983 malicious prosecution claim to be premised on a civil or administrative

proceeding rests on the reading of two cases: the U.S. Supreme Court's plurality decision in

*Albright v. Oliver*, 510 U.S. 266 (1994), and the Second Circuit's decision in *Singer v. Fulton

County Sheriff*, 63 F.3d 110 (2d Cir. 1995). In *Albright v. Oliver*, the U.S. Supreme Court

rejected a general 14th Amendment substantive due process right as the basis for a § 1983

malicious prosecution claim and instead required a Fourth Amendment basis. In *Singer v.

Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995), the Second Circuit stated that "[t]he

Fourth Amendment right implicated in a malicious prosecution action is the right to be free

of unreasonable seizure of the person -- i.e., the right to be free of unreasonable or

unwarranted restraints on personal liberty," 63 F.3d at 116, and that "a plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of 'seizure'." *Washington v. County of Rockland*, 373 F.3d at 316, quoting in part *Singer v. Fulton County Sheriff*, 63 F.3d at 117. In the view of the Second Circuit, "[c]onsidered in tandem, *Singer* and *Albright* stand for the proposition that to sustain a § 1983 malicious prosecution claim, there must be a seizure or other "perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment.'" *Washington v. County of Rockland*, 373 F.3d at 316, quoting in part *Singer v. Fulton County Sheriff*, 63 F.3d at 117.

That "seizure or other "perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment'" occurred here. As discussed above (pp. 5-6), when Captain Carione told Plaintiff Lewis that he had to pull his retirement papers or else he would be fired, Captain Carione also gave Plaintiff a notice to appear at a GO15 hearing at Captain Carione's office in Brooklyn. Plaintiff Lewis felt that he had no real option but to withdraw his retirement papers. About one week later, on March 17, 2008, Plaintiff Lewis appeared for the GO15 at Captain Carione's conference room at Internal Affairs Bureau-Brooklyn. Captain Carione asked Plaintiff Lewis questions for the better part of the day, before and after lunch. During the hearing, Captain Carione constantly was breaking to make phone calls. After the last phone call, Captain Carione took Plaintiff Lewis' shield and Plaintiff Lewis' NYPD identification card. Plaintiff

Lewis was informed that he was on suspension without pay, which meant that he would be hit with disciplinary charges (which Plaintiff Lewis was). Plaintiff Lewis was under no less effective restraint when Captain Carione was interrogating him than when an individual subject to arrest by Plaintiff Lewis. He was not free just to pick up and leave. Meanwhile, that same day, Captain Carione sent a memo to Chief of Internal Affairs Charles Campisi informing him about the suspension of Plaintiff Lewis. (Byler Decl. Ex. A: Lewis Decl. ¶¶ 12-14; Byler Decl. Ex. EE: Carione March 17, 2008 Memo to Campisi re Suspension of Sgt. William Lewis.)

The § 1983 malicious prosecution claim with respect to the Departmental trial does reflect "a perversion of proper legal procedures" and does implicate the larger liberty interests of Plaintiff Lewis, as he was not allowed to retire and enjoy a well earned pension but instead he was forced to endure a Departmental disciplinary trial on bogus corruption charges based on, as discussed above (pp. 8-14), non-existent or false evidence.

**B.    Individual Defendants Kelly, Campisi, Carione and Crespo Were Involved In The Departmental Prosecution Of Plaintiff Lewis On Corruption Charges.**

Defendants deny that all the individual Defendants initiated the prosecution of the Departmental charges in Disciplinary Case Nos. 82103/06, 82873/07 & 83810/08, noting the generality of the pleading in the Complaint. (Dfs. Mem. of Law, pp. 6-8.) To be sure, not all the individual Defendants were involved in the Departmental prosecution of Plaintiff Lewis, but the joining of the individual Defendants is based on four of the causes of action stated in the Complaint, not just one. Further, individual Defendants Kelly, Campisi, Carione

and Crespo were involved in the Departmental prosecution of Plaintiff Lewis on the bogus corruption charges so as to be liable under 42 U.S.C. § 1983.

As the Second Circuit has made clear, there is more than one way a person, particularly one in a supervisory capacity, can be held liable under § 1983 -- not just by direct participation, but also by gross negligence in supervision, creation of policy or custom, failure to remedy wrong or deliberate indifference when knowledgeable of violation. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

As discussed above (pp. 4-6), the corruption charges were "investigated" by the NYPD Internal Affairs Bureau headed by Defendant Campsi and conducted by Defendants Carione and Crespo, which included their coming up with the false phone record evidence. (Byler Decl. Ex. X: Carione Depo pp. 159-166; Byler Decl. Ex. Y: Crespo Depo pp. 119-126.) As discussed above (pp. 6-8), Plaintiff Lewis was tried on the corruption charges at the direction of Defendant Kelly, who nixed the "settlement" that was approved by the NYPD Advocate's Office and that would have allowed Plaintiff Lewis to retire and claim his pension. (Byler Decl. Ex. GG: O'Neal Depo pp. 31-31; Byler Decl. Ex. HH: Slater Depo pp. 30-32.)

Defendants invoke *Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999), and two district court cases for the broad proposition that the charging of a person breaks the chain of causation from the police officer's arrest and the prosecution. Differently, however, *Townes v. City of New York* stands for an application of the legal principle of "intervening

cause," a legal concept that does not apply to the circumstances here, not with the false phone record evidence and not with the nixing of the "Negotiated Settlement" for the purpose of getting Plaintiff Lewis fired.

## C. There Was No Probable Cause For Plaintiff Lewis' Departmental Trial On Corruption Charges.

Defendants state that probable cause is a complete defense to malicious prosecution unless additional facts came to light negating probable cause, citing such cases as *Wong v. Yoo*, 649 S. Supp.2d 34, 66-67 (E.D.N.Y. 2009), and *Johnson v. City of New York*, 2008 U.S. Dist. LEXIS 78984 (S.D.N.Y. 2008), and assert that there was probable cause for the prosecution of the Departmental charges in Disciplinary Case Nos. 82103/06, 82873/07 & 83810/08. (Dfs. Mem. of Law, pp. 8-10.) The basis for Defendants' assertion about probable cause is, however, a muddled misstatement of Plaintiff Lewis' position and an incomplete reference to the Departmental disciplinary decision of NYPD Deputy Commissioner of Trials Martin G. Karopkin.

There was no probable cause for the prosecution of Plaintiff Lewis on the corruption charges in Disciplinary Case No. 83810/08. As discussed above (pp. 9-11), the trial record was devoid of real evidence supporting those corruption charges. The charge of revealing an undercover operation was, by trial's end, an embarrassment to the NYPD: the hearsay basis was not supported; phone records said to be critically important provided no substantive content and were in any event indisputably false; the evidence showed that Plaintiff Lewis did not even know about the undercover operation; the video showed Vice blowing their own

cover; the prosecution witnesses performed badly for a bad case. Similarly, the charge of intimidation was lacking in proof: the hearsay basis was not supported; the tapes said to establish intimidation did not at all. As Plaintiff Lewis testified, he did not employ persons who engaged in business dealings with establishments participating in illegal gambling.

The Departmental disciplinary decision of NYPD Deputy Commissioner of Trial Martin Karopkin found Plaintiff Lewis not guilty of these serious corruption charges. (Byler Decl. Ex. D: First Karopkin Decision.) While Deputy Commissioner Karopkin criticized Plaintiff Lewis for not keeping his police work and off-duty employment more separate, which Deputy Commissioner Karopkin viewed as a serious matter, Deputy Commissioner Karopkin stated in his decision:

> On the other hand, there is before this Court no evidence of corrupt or inappropriate behavior in connection with his enforcement duties. He issued summonses, apparently closed down bars and got good ratings from his supervisor who described his job performance as "excellent."

(Byler Decl. Ex. D: First Karopkin decision, p. 202.)

Given what happened at trial and the state of the trial evidence, there are genuine issues of material fact as to probable cause for the corruption charges in Disciplinary Case No. 83810/08.

## D. **Defendants Acted With Malice.**

Defendants cite and quote _Lowth v. Town of Cheektowaga_, 82 F.3d 563, 573 (2d Cir. 1996), for the proposition that in the context of a malicious prosecution claim, malice consists of "a wrong or improper motive, something other than a desire to see the ends of

-31-

justice served" and assert that Plaintiff Lewis has failed to come forward with proof of malice, suggesting that Plaintiff Lewis is relying upon inadmissible conjecture. (Dfs. Mem. of Law, p. 10.) The short answer is that Defendants are not facing up to the record that clearly shows there are material issues of fact as to the requisite malice. As discussed above (pp. 8-14), Plaintiff Lewis was not allowed to retire and enjoy a well earned pension, but rather was forced to endure a Departmental disciplinary trial on bogus corruption charges based on non-existent or false evidence. Also, as discussed above (pp. 12-13), even after Deputy Commissioner Karopkin had issued his decision finding Plaintiff Lewis not guilty of the corruption charges, the NYPD still formally sought Plaintiff Lewis' termination.

## II.

### PLAINTIFF LEWIS' § 1983 CLAIMS FOR FALSE ARREST AND MALICIOUS PROSECUTION FOR "STRUCTURING" ARE MERITORIOUS

Defendants' second main argument is that Plaintiff Lewis' claims for § 1983 false arrest and malicious prosecution with respect to "structuring" must be dismissed, again premising that argument on four points. (Dfs. Mem. of Law, pp. 11-19.) None of these points has merit either.

#### A. Defendant Sarayli Was Involved In Plaintiff Lewis' Arrest and Prosecution For "Structuring."

Defendants argue that the arrest and prosecution of Plaintiff Lewis for "structuring" was done by the federal authorities and that there is a presumption the prosecutor exercised independent judgment in bringing a criminal case, *Alcantara v. City of New York*, 646

F.Supp.2d 449, 457 (S.D.N.Y. 2009); thus, argue Defendants, absent evidence that a defendant "played an active role in the prosecution, such as giving advice and encouragement or importuning authorities to act," *Espada v. Schneider*, 522 F.Supp.2d 544, 553 (S.D.N.Y. 2007), Defendants cannot be found liable for the arrest and prosecution of Plaintiff Lewis for the offense of "structuring." (Dfs. Mem. of Law, pp. 11-13.)

This case clearly involves a situation where Defendant Sarayli of the NYPD Internal Affairs Bureau "played an active role in the prosecution, such as giving advice and encouragement or importuning authorities to act." As discussed above (pp. 14-15), Sarayli obtaining records from the Secretary of State about Plaintiff Lewis' businesses and subpoenaing bank records from Community Bank (Richmond County Savings Bank) and compiled it in a calendar to show withdrawals. Sarayli met with an Assistant United States Attorney and delivered his investigation materials to the U.S. Attorneys Office. Sarayli also met with Immigration and Customs Enforcement ("ICE") agents Shawn Polonet and Christopher Costa. The information contained in Costa's affidavit for an arrest warrant was from Sarayli's subpoenaed information and investigation. (Byler Decl. Ex. S: Sarayli Depo pp. 70-75, 85-87; Nimick Decl. Ex. U: Sarayli calendar.) Also, as discussed above (p. 20), when it came to trial, representatives of the Internal Affairs Bureau were present during the trial in the courtroom. (Byler Decl. Ex. A; Lewis Decl. ¶ 32.) Sarayli was so invested in the structuring charge that in August 2010, Frank Sarayli wrote a memorandum for the file "closing" the investigative file on the charges against Plaintiff Lewis for structuring and

unauthorized off-duty employment finding them "substantiated." (Byler Decl. Ex. W: Sarayli Depo Ex. 39; Byler Decl. Ex. T: Sarayli Depo pp. 218-226.)

**B.    The Second Circuit Requires Probable Cause To Immunize An Arrest.**

Defendants argue that Plaintiff Lewis was arrested pursuant to a valid warrant; thus, they say, Defendants cannot be held liable for false arrest, citing an unofficially reported Southern District case, *Davis v. United States*, No. 03-1800, 2004 U.S. Dist. LEXIS 2551 (S.D.N.Y. Feb. 18, 2004), and a New York state case, *Boose v. Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740 (4th Dep't 1979). Defendants dwell on the formal requirements for an arrest warrant. (Dfs. Mem. of Law, pp. 11-13.)

The Second Circuit case law appears to be different. The Second Circuit case cited by Defendants, *Weyant v. Okst*, 101 F.3d 845, 855 (2d Cir. 1996), is acknowledged to require probable cause and does not refer to a valid warrant being the basis for immunity from liability. (Dfs. Mem. of Law, p. 11.) Indeed, in *Weyant v. Okst*, summary judgment was denied because there were triable issues concerning, among other things, probable cause for the arrest.

**C.    There Was No Probable Cause For The
Arrest of Plaintiff Lewis For "Structuring."**

Defendants argue that there was probable cause for the arrest of Plaintiff Lewis. (Dfs. Mem. of Law, pp. 15-16.) The short answer is that no, there was not; and there are at least material issues of fact whether there was probable cause. The Affidavit of Christopher Costa, relied upon by Defendnats, recites what were the investigation results of Defendant

Sarayli, which is to say that it concerned only a review of bank records so as to show what appeared to be "structuring" without consideration of two of three elements of "structuring" under 18 U.S.C. § 5313 -- knowledge of the financial reporting requirement as to withdrawals above $10,000 and an intent to evade that reporting requirement. (Byler Decl. Ex. U: Sarayli Depo Ex. 39.) Plaintiff Lewis was found not guilty by the jury because, as discussed above (p. 20), proof of the "structuring" case failed badly as to all three elements of "structuring." Plaintiff Lewis had testified that he had not engaged in structuring with an intent to evade the reporting requirement, there was a filing of a CRT and teller Ms. Melissa Dombrowsky at the Community Bank testified to the circumstances of Plaintiff Lewis withdrawing monies in a way that supported Plaintiff Lewis' defense. (Byler Decl. Ex. A: Lewis Decl. ¶¶ 31-32; Byler Decl. Ex. U: Sarayli Depo Ex. 39, Structuring Trial Transcript; Byler Decl. Ex. BB: Dombrowsky testimony in federal structuring trial.)

Defendants contend in this connection that probable cause to arrest requires only a probability, not an actual showing, of criminal activity, citing such cases as *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983), and *Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 128 (2d Cir. 1997), and that the validity of an arrest does not depend upon an ultimate finding of guilt or innocence, citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967), and *Weyant v. Okst*, 101 F.3d at 852. (Dfs. Mem. of Law, p. 16.) While valid as general points of law, they do not help Defendants in the circumstances here on summary judgment. Given the narrowness of the "investigation" into structuring that essentially ignored elements of the

offense, the "structuring" case against Plaintiff Lewis was not one that should have been brought.

**D.     Plaintiff Lewis Can Overcome Any Presumption Of Probable Cause That Attaches To The Indictment.**

Defendants argue that they have a complete defense to a claim of § 1983 malicious prosecution because Plaintiff Lewis cannot overcome the rebuttable presumption of probable cause that attaches to the indictment.  Defendants acknowledge that the presumption can be overcome by proof that the indictment was obtained by perjury, the suppression of evidence, fraud or other misconduct, but insist that Plaintiff Lewis has no such proof.  Defendants also cite to the U.S. Supreme Court's decision in *Rothberg v. Paulk*, __ U.S. ___, 132 S.Ct. 1497 (2012), that recognized an immunity for witnesses who testify before the grand jury as making more difficult the ability of a § 1983 malicious prosecution to overcome the rebuttable presumption of probable cause.  (Dfs. Mem. of Law, pp. 16-19.)

The real problem for a § 1983 malicious prosecution plaintiff overcoming a rebuttable presumption of probable cause is the secrecy of grand jury proceedings, not a grand jury witness immunity.  Typically, inferences must be drawn from the proof at trial when, as here, there is a "not guilty" verdict, whether there were new facts that came to light to negate an initial finding of probable cause, *see Rae v. County of Suffolk*, 693 F.Supp.2d 217 (E.D.N.Y. 2010), or whether there were facts that would have precluded criminal liability in the first place had they been presumably presented.  That being noted, the jury in this case did find Plaintiff Lewis not guilty of structuring after a full presentation of evidence.  (Nimick Decl.

Ex. Q.)  There was an adversary process at trial, which was there was not during the grand

jury proceedings; and thus, there was not an attorney for Plaintiff Lewis pointing out that

proof of basic elements of a structuring case under 18 U.S.C. § 5313 was entirely missing.

The bank teller Melissa Dombrowsky and Plaintiff Lewis testified at trial, and what they

testified to provided a basis for a not guilty verdict given that it was clear then that basic

elements fo the structuring offense were not satisfied.

## III.

## PLAINTIFF LEWIS ADEQUATELY PLED AND HAS A MERITORIOUS § 1983 DEFAMATION STIGMA-PLUS CLAIM

Defendants' third main argument is that Plaintiff Lewis' claim for § 1983 defamation

stigma-plus was not adequately pled.  Defendants recognize that a § 1983 claim may be

brought for defamation if coupled with "stigma-plus" -- *i.e.*, "a claim brought for injury to

one's reputation (the stigma) coupled with deprivation of some 'tangible interest' or property

right (the plus), without adequate process." *Segal v. City of New York*, 459 F.3d 207, 213

(2d Cir. 2006), *quoting DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003); *see also*

*Patterson v. City of Utica*, 370 F.3d 32, 330 (2d Cir. 2004)("loss of one's reputation can . .

. invoke the protections of the Due Process Clause if that loss is coupled with the deprivation

of a more tangible interest, such as government employment"); *Bishop v. Wood*, 426 U.S.

341, 348-349 (1976)(a § 1983 defamation stigma-plus claim technically a substantive due

process matter).  Defendants assert, however, that Plaintiff Lewis has not alleged any facts

to support the claim and did not pursue Article 78 remedies, a failure which is said to

preclude any procedural due process claim under § 1983. (Dfs. Mem. of Law, pp. 19-23.)

Defendants' argument is without merit. The "defamation" part of the § 1983 defamation stigma-plus claim was clearly pled and indeed should be evident from the record that Plaintiff Lewis was treated throughout as if he had been guilty of corruption when in fact Plaintiff Lewis proved he was not guilty of any corruption and even Deputy Commissioner Karopkin found Plaintiff Lewis was not guilty of corruption. (Nimick Decl. Ex. A: Complaint ¶¶189-196; discussion *infra*, pp. 8-20, 31.) The "plus" part of the §1983 defamation stigma-plus claim was also pled and indeed is beyond dispute: Plaintiff was terminated from the NYPD on March 9, 2010 with loss of the pension that he had earned as a 20+ year veteran of the NYPD. (Nimick Decl. Ex. A: Complaint ¶¶ 193, 195; Nimick Decl. Ex. P; Byler Decl Ex. A: Lewis Decl. ¶¶ 29, 33.)

Defendants' argument that Plaintiff Lewis did not pursue an administrative remedy fails because a § 1983 defamation stigma-plus claim is a grounded in substantive due process, not procedural due process. *Bishop v. Wood*, 426 U.S. at 348-349.

## IV.

## THE DEFENDANT CITY OF NEW YORK IS LIABLE UNDER *MONELL*

Defendants' fourth main argument is that according to *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690-691 (1978), in order to prevail on a § 1983 claim against a municipality such as the City of New York, a plaintiff must show that a municipal policy or custom caused the deprivation of constitutional rights; that to state a claim for municipal liability, a plaintiff

must allege either the existence of a formal policy, or an official responsible for establishing policy caused the alleged violation, or the existence of an unlawful practice by subordinate officials sufficiently established so as to constitute a custom or usage, or a failure to train or supervise that amount to deliberate indifference to the rights of others; and that per these standards, Plaintiff Lewis' claim for § 1983 against the City of New York fails, as there was no constitutional violation by Defendants, there was no policy or custom that was the moving force behind any constitutional violations, there was no policy or custom and there was no violations caused by subordinates or deliberate indifference. (Dfs. Mem. of Law, pp. 24-28.)

Defendants' argument is without merit. The Complaint alleges the requisite *Monell* policy or custom: that Defendants City and Kelly had in effect de fact policies, practices, customs and usages that condoned and fostered the unconstitutional conduct of Defendants and were a proximate cause of Plaintiff Lewis's damages and injuries; that the culture of political favoritism and corruption has resulted in a "vendetta" against Plaintiff Lewis; that there has been a culture of misconduct that is exemplified by the NYPD's uneven treatment of police officers facing charges; that Defendants City and Kelly acted with deliberate indifference by failing to address systemic practices and defending the pattern and practice of unlawful acts carried out in furtherance of police misconduct and political favoritism. (Nimick Decl. Ex. A: Complaint ¶¶ 179, 181, 183, 184.)

Plaintiff Lewis has laid the cause of what he has testified to as a "vendetta" against him at the feet of a policy or custom for which Defendants City and Kelly are responsible.

(Byler Decl. Ex. S: Lewis Depo p. 268.) _Richardson v. Goord_, 347 F.3d 431, 435 (2d Cir. 2003) (liability for creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue).

The Departmental prosecutions, investigations and unreasoning conduct carrying out the "vendetta" have an ultimate source that has nurtured such behavior, and it is what is alleged in the Complaint as the policy or custom. (Nimick Decl. Ex. A: Complaint ¶¶ 179, 181, 183, 184.) As discussed above (pp. 6, 8, 12-16, 19, 21), the higher levels of authority in the NYPD were involved in the "vendetta" against Plaintiff Lewis -- Campisi was immediately advised by Carione of Plaintiff Lewis' suspension; Kelly nixed the "Negotiated Settlement" and directed the case go to trial to get Plaintiff Lewis fired; Kelly ordered the probationary dismissal despite the not guilty findings as to the corruption charges; after an Internal Affairs Bureau investigation of "structuring," Campisi was advised by Colamussi and Campisi advised Kelly that Plaintiff Lewis had been arrested on "structuring"; the persistent effort by the Advocate's Office headed by Schwartz to have Plaintiff Lewis terminated despite not having the cases to do it; the termination memorandum relying on the probationary dismissal, the structuring case without a verdict and unserved charges about off-duty employment without regard to the lack of any corruption and any due process as to structuring and the off-duty employment; Schwartz after the termination padded Plaintiff Lewis' personnel folder to justify termination; Sarayli promptly advised Campisi of the federal court not guilty verdict.

It is also well settled that "municipal liability under Section 1983 can be based on municipal supervisors' knowing acquiescence in the unconstitutional behavior of their subordinates" and that "the knowledge of the supervisors may be inferred from a persistent violation of a statutory duty to inquire about the unconstitutional behavior of their subordinates and a failure to prevent the unconstitutional acts." *Thomas v. New York City*, 814 F. Supp. 1139, 1151 ( E.D.N.Y 1993), *quoting and citing Krulik v. Board of Education*, 781 F. 2d 15, 23 (2d Cir. 1986), and *Villante v. Department of Corrections*, 786 F. 2d 516, 519 (2d Cir. 1986). In *T.S. ex rel v. Muhammed*, 2008 WL 4446671 (E.D.N.Y 2008), a *Monell* claim was upheld against the City because the same physician made a number of inaccurate diagnoses of child abuse: where there is "deliberate indifference to known custom or practice of its employees, " the court may find a "policy, practice or decision" sufficient to impose liability." *V.S. ex rel T.S. v. Muhammed*, 2008 WL 4446671 at 18.

## CONCLUSION

For the reasons stated above, this Court should deny Defendants' motion for summary judgment, order the case to jury trial and grant such further and other relief as the Court deems just and proper.

**Dated:  New York, New York
           April 4, 2014**

**NESENOFF & MILTENBERG, LLP**

By:____*Philip A. Byler, Esq.*_____
    **Philip A. Byler, Esq.
    Andrew T. Miltenberg, Esq.
    Megan S. Goddard, Esq.
    363 Seventh Avenue - Fifth Floor
    New York, New York 10001
    212.736.4500**

- and -

LAW OFFICES OF JEFFREY LICHTMAN

By: _____*Jeffrey H. Lichtman, Esq.*_____
        Jeffrey H. Lichtman, Esq.
750 Lexington Avenue - 15th Floor
New York, New York 10022
212-581-1001

Attorneys for Plaintiff William Lewis